**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 28, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

| | |
|---|---|
| PAUL B. JONES, individually and on behalf of a class of similarly situated individuals, | |
| Plaintiff - Appellant, | No. 04-4185 |
| v. | |
| SALT LAKE COUNTY, a body politic and corporate of the State of Utah; AARON KENNARD, Salt Lake County Sheriff; PAUL CUNNINGHAM, Captain, Salt Lake County Metro Jail; JOHN MERRICK, Lieutenant, Salt Lake County Metro Jail, | |
| Defendants - Appellees. | |
| _____ | |
| PRISONER'S LEGAL NEWS, a nonprofit Washington corporation, | |
| Plaintiff - Appellant, | No. 04-4186 |
| v. | |
| PETE HAUN, Executive Director, Utah Department of Corrections; FRED H. VANDERVEUR, Director, Institutional Operations, Division of Institutional Operations, Utah Department of Corrections; KERRY | |

GALETKA; BRYANT HERMAN,

Defendants - Appellees.

---

**Appeal from the United States District Court
for the District of Utah
(D.C. Nos. 2:96-CV-637-PGC & 2:98-CV-287-PGC)**

---

Brian M. Barnhard (James L. Harris, Jr. with him on the briefs), Utah Legal Clinic, Salt Lake City, Utah, for Plaintiffs-Appellants.

Nicholas M. D'Alesandro, Deputy District Attorney (David E. Yocom, District Attorney for Salt Lake County, and John P. Soltis, Deputy District Attorney, with him on the brief) Office of the District Attorney for Salt Lake County, Salt Lake City, Utah, for Defendants -Appellees Salt Lake County, Kennard, Cunningham and Merrick.

Brent A. Burnett, Assistant Attorney General (Mark L. Shurtleff, Attorney General, and Alain C. Balmanno, Assistant Attorney General, with him on the brief) Office of the Attorney General for the State of Utah, Salt Lake City, Utah, for Defendants - Appellees Haun, Vanderveur, Galetka and Herman.

---

Before **TACHA**, Chief Judge, **McWILLIAMS** and **O'BRIEN**, Circuit Judges.

---

**O'BRIEN**, Circuit Judge.

---

The district court considered complaints from eleven inmate plaintiffs, including Paul B. Jones, and one corporate plaintiff, Prisoner's Legal News (PLN). The eleven inmate plaintiffs were all incarcerated at either the Utah State Prison, the Salt Lake County Jail or the San Juan County Jail. The inmates and

PLN filed several lawsuits against these facilities' officers challenging the constitutionality of their mail regulations under 42 U.S.C. § 1983. The cases were referred to a magistrate judge, who recommended dismissal under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A for failure to state a claim upon which relief may be granted.[1] The district court adopted that recommendation. Three appeals followed: Appeal Nos. 04-4185 (*Jones v. Salt Lake County, et al.*), 04-4186 (*Prisoner's Legal News v. Haun, et al.*) and 04-4187 (*Prisoner's Legal News v. Christensen, et al.*). The appeals were consolidated. In December 2004, Appeal No. 04-4187 was dismissed by stipulation. Therefore, only Appeal Nos. 04-4185 and 04-4186 remain.

Because Appeal No. 04-4185 addresses the mail regulations at the Salt Lake County Jail (County Jail) and Appeal No. 04-4186 addresses the mail regulations at the Utah State Prison (State Prison), we discuss each appeal separately. However, before turning to the merits, we address whether it was proper to dismiss the parties' complaints under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, an issue common to both appeals.

## I. 28 U.S.C. § 1915(e)(2)(B) and § 1915A

The first lawsuit filed in the district court, *Farnsworth v. Salt Lake Metro Jail*, was initiated on January 21, 1994. Jones filed his case challenging the

---

[1] The magistrate did conclude the Salt Lake County Jail's former ban on newspapers was unconstitutional. This issue is not before us.

County Jail's regulations on August 30, 1996. PLN, along with inmate Walter

Thomas, filed their lawsuit challenging the State Prison's bulk-rate mail policies

on April 23, 1998. The Jones and PLN-Thomas complaints, along with a number

of other related prisoner complaints, were consolidated with *Farnsworth*. On

October 14, 2003, the magistrate judge issued a report and recommendation.

Therein, the magistrate listed seventeen pending motions filed by the various

parties. He then stated:

> Under 28 U.S.C. § 1915(e)(2)(B)[] and 28 U.S.C. § 1915A, this
> Court may dismiss a complaint filed if satisfied that the action fails
> to state a claim upon which relief may be granted. Pursuant to these
> motions and the Court's screening ability, every motion in every case
> of this action is before the Court.

(Appellant's App. Vol. 1 at 41 (citations omitted).) In recommending dismissal,

the magistrate again cited 28 U.S.C. §§ 1915(e)(2)(B) and 1915A. On March 29,

2004, the district court adopted (with one clarification) the magistrate's

recommendation "in all respects." (*Id.* at 81.)

Jones and PLN argue the district court improperly dismissed their

complaints under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A. They claim

§ 1915(e)(2)(B) only applies to *in forma pauperis* actions and they paid the filing

fees.[2] As to § 1915A, PLN argues it applies only to prisoner complaints and

_____

[2] Section 1915 is entitled "Proceedings in forma pauperis" and allows a
court to authorize the commencement of any suit or appeal without prepayment of
the filing fees if the person is unable to pay such fees. 28 U.S.C. § 1915(a)(1).
Subsection (e)(2)(B) provides:

therefore its complaint could not be dismissed under § 1915A.[3]  While Jones

concedes his complaint is a prisoner complaint, he contends § 1915A requires

screening of complaints "before docketing, if feasible or, in any event, as soon as

practicable after docketing."  28 U.S.C. § 1915A(a).  Because his complaint was

not screened until 2003, seven years after its filing, he argues its dismissal was

not authorized under § 1915A and was contrary to the statute's intent, *i.e.*, to

---

Notwithstanding any filing fee, or any portion thereof, that may have
been paid, the court shall dismiss the case at any time if the court
determines that– . . .

> (B) the action or appeal--
>
> > (i) is frivolous or malicious;
> >
> > (ii) fails to state a claim on which relief may be granted; or
> >
> > (iii) seeks monetary relief against a defendant who is immune
> > from such relief.

[3] Section 1915A provides in relevant part:

(a) Screening.--The court shall review, before docketing, if feasible
or, in any event, as soon as practicable after docketing, a complaint
in a civil action in which a prisoner seeks redress from a
governmental entity or officer or employee of a governmental entity.

(b) Grounds for dismissal.--On review, the court shall identify
cognizable claims or dismiss the complaint, or any portion of the
complaint, if the complaint--

> (1) is frivolous, malicious, or fails to state a claim upon which relief
> may be granted; or
>
> (2) seeks monetary relief from a defendant who is immune from such
> relief.

weed out meritless inmate complaints before or immediately after filing.[4]

While Jones and PLN's arguments may have merit, we need not resolve them here because Jones and PLN failed to object to the magistrate's report and recommendation on those grounds. We have adopted a "firm waiver rule" whereby the failure to timely object to a "magistrate's findings or recommendations waives appellate review of both factual and legal questions." *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991). "This rule does not apply, however, when (1) a *pro se* litigant has not been informed of the time period for objecting and the consequences of failing to object, or when (2) the interests of justice require review." *Morales-Fernandez v. I.N.S.*, 418 F.3d 1116, 1119 (10th Cir. 2005) (quotations omitted). Neither exception to the firm waiver rule applies here. First, Jones and PLN did not proceed *pro se*; they were represented by counsel.[5] Second, the interests of justice do not require suspension of the rule. While the district court may have inappropriately dismissed Jones' and PLN's complaints pursuant to §§ 1915(e)(2)(B) and 1915A, we can simply construe the district court's actions as a sua sponte grant of summary judgment to the defendants because it appears both the magistrate and

---

[4] Jones asserts his complaint was not screened until 2004. However, the magistrate screened his complaint in 2003; its dismissal occurred in 2004.

[5] The magistrate only advised the parties they had ten days in which to file objections to the report and recommendation; he failed to inform them of the consequences of a failure to object. Therefore, had the parties been *pro se*, the firm waiver rule would not have applied.

district court considered and relied on evidence outside the pleadings. *See* FED. R. CIV. P. 12(b). Although not favored, "a sua sponte order of summary judgment may be appropriate if the losing party was on notice that [they] had to come forward with all of [their] evidence. If a losing party was not prejudiced by the lack of notice, we will not reverse simply because the grant of summary judgment came sua sponte." *Ward v. Utah*, 398 F.3d 1239, 1245-46 (10th Cir. 2005) (citation and quotations omitted). There is no indication of prejudice here. Prior to the district court's dismissal, Jones had filed a motion for partial summary judgment on the issue of liability and his request for injunctive relief and PLN had responded to the Haun Defendants' motion for summary judgment. Additionally, Jones and PLN conceded at oral argument that summary judgment was the appropriate standard.

We now turn to the merits of each appeal. We review de novo a grant of summary judgment. *Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1182 (10th Cir. 1995). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

These appeals require us to determine the constitutionality of certain mail regulations at the County Jail and State Prison. To determine whether the challenged regulations are valid, we apply the standard set forth in *Turner v.*

*Safley*, 482 U.S. 78 (1987). *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989) (holding *Turner* analysis applies to prison regulations affecting the sending of a publication to an inmate, *i.e.*, incoming publications). Under *Turner*, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. In making this determination, we are guided by four factors. *Id.* at 89-90.

"First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* at 89 (quotations omitted). The logical connection between the regulation and its asserted goal(s) cannot be so remote as to render the regulation arbitrary or irrational. *Id.* at 89-90. The legitimate governmental objective must also be neutral. *Id.* at 90. A regulation restricting an inmate's First Amendment rights must operate without regard to the content of the expression. *Id.* Where a regulation furthers an important or substantial government interest unrelated to the suppression of expression, the neutrality requirement is met. *Thornburgh*, 490 U.S. at 415. In other words, where prison officials "draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' . . . ." *Id.* at 415-16.

Second, we ask "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. "[T]he right in question must be viewed sensibly and expansively." *Thornburgh*, 490 U.S. at 417

(quotations omitted). "Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation." *Turner*, 482 U.S. at 90 (citation and quotations omitted). The "alternatives need not be ideal[;] they need only be available." *Wardell v. Duncan*, 470 F.3d 954, 961 (10th Cir. 2006) (quotations omitted). Even if the alternative is not the "best method from the inmate's point of view, . . . the second *Turner* factor does not undercut the challenged restriction." *Id.* at 961-62 (quotations omitted).

Third, we examine the impact accommodation of the asserted constitutional right would have on guards, other inmates, and prison resources. *Turner*, 482 U.S. at 90.

> In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order. When accommodation of an asserted right will have a significant ripple effect on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials.

*Id.* at 90 (quotations omitted); *see also Thornburgh*, 490 U.S. at 418 (where the right in question can only be exercised "at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike, the courts should defer to the informed discretion of corrections officials") (citation and quotations omitted).

Finally, we determine whether obvious, easy alternatives exist that fully accommodate inmates' rights at *de minimis* cost to valid penological interests. If so, the regulation may not be reasonable but an "exaggerated response" to prison concerns. *Thornburgh*, 490 U.S. at 418 (quotations omitted); *Turner*, 482 U.S. at 90. However, "[t]his is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Turner*, 482 U.S. at 90-91. Nevertheless, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91.

With these principles in mind, we address each appeal.

## II. Appeal No. 04-4185 (*Jones v. Salt Lake County, et al.*)

In 1996, Jones was a federal pre-trial detainee at the Salt Lake County Jail, having been incarcerated there since December 1994. On August 30, 1996, he filed suit against Salt Lake County, Aaron Kennard (the County Sheriff), Paul Cunningham (the County Jail's captain), and John Merrick (the County Jail's lieutenant) challenging the jail's policies regarding inmate access to newspapers, magazines, catalogs, technical publications, sexually explicit material and paperback books under the First and Fourteenth Amendments of the United States Constitution. The magistrate recommended dismissal of Jones' complaint.

Because Jones was no longer an inmate at the jail at the time of the report and recommendation, the magistrate concluded his claims for declaratory and injunctive relief were moot. He also determined (relevant to Jones' appeal): (1) the jail's ban on sexually explicit material is not unconstitutional because it is rationally related to the goals of prison security and inmate rehabilitation, (2) the jail's ban on paperback books is not unconstitutional because it contains an exception for books sent directly from the publisher and allows inmates to receive books from the jail library and (3) the jail's ban on catalogs is not unconstitutional.

Jones agreed his claims for declaratory and injunctive relief were moot. However, he objected to the magistrate's remaining conclusions adopted by the district court. On appeal, Jones challenges the constitutionality of the County Jail's regulations regarding (1) sexually explicit material/technical publications, (2) paperback books and (3) catalogs. He claims these regulations infringed on his constitutional rights during his incarceration at the jail and he is entitled to monetary damages for that infringement. We address each regulation separately.

A. Sexually Explicit Material/Technical Publications

On June 11, 1995, Jones filed a grievance stating he wished to subscribe to several magazines. He requested jail personnel to indicate which magazines were not allowed and to provide him the jail's policy concerning incoming publications. On June 13, 1995, Lieutenant Merrick responded to Jones' request,

granting it as to National Geographic, Newsweek, U.S. News, Reader's Digest and New Era but denying it as to Playboy, Easyrider, In the Wind, Tattoo, Penthouse, Soldier of Fortune, Guns-n-Ammo, Combat Auto and Mother Earth News. It also referred Jones to the jail's policy regarding publications and attached that policy. On June 20, 1995, Jones requested a more detailed explanation of the jail's guidelines on inflammatory, technical and sexually explicit materials. The next day, Lieutenant Merrick responded, "While I appreciate your input you have received the policy you requested." (R. Appellant's App. Vol. 1 at 235.)

The jail's policy in effect at the time of Jones' request was Special Order No. 94-14. Sometime between June 1994 and June 1995, Special Order 94-14 was incorporated into the Salt Lake County Metro Jail Policy & Procedure Manual. This manual states in relevant part:

(10) Publications

> (a) Prisoners will be allowed reading materials subject to restrictions consistent with Jail security concerns.
>
> (b) Magazines and/or newspapers will only be accepted when mailed directly from the publisher.
>
> (c) Publications permitted
>
>> (I) Magazines meeting policy guidelines.
>>
>> (ii) Newspapers.
>
> (d) Publications not permitted

(I) Calendars, free samples, sweepstake type application forms, and/or any other junk mail will be refused or discarded.

(ii) Catalogs, technical publications, and/or any sort of sexually explicit material.

(R. Appellant's App. Vol. 1 at 202.)

Lieutenant Merrick testified the policy manual did not define "consistent with Jail security concerns," "catalogs," "technical publications" or "sexually explicit material." Although there were no written definitions, he stated "sexually explicit material" meant pictures of "breasts and genitals" and "technical publications" meant reading material containing "information on weapons, escapes, how to make alcohol, how to hide contraband, [and] how to move contraband."[6] (R. Appellant's App. Vol. 1 at 205, 220, 227.)

Jones argues the County Jail's ban on sexually explicit material and technical publications is unconstitutional based on its use of vague and general terms. Specifically, he contends the policy does not define "technical publications," "sexually explicit material" or "consistent with Jail security concerns." He also argues it does not provide any criteria for jail officials to use when applying this policy. He claims such vague and unwritten rules grant prison officials unbridled discretion to refuse certain reading materials based on their

---

[6] David Hanson, the County Jail's mail clerk, also defined "sexually explicit material" as photographic representations of breasts and genitals. He defined technical publications as those oriented toward violence but admitted his understanding of technical publications may "need some upgrading." (R. Appellant's App. Vol. 1 at 229.)

-13-

own interpretation of these terms. He alleges this constitutes prior restraint and runs the risk of unconstitutional censorship. In support of this argument, Jones cites *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988), and *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985).

Jones' reliance on *City of Lakewood* and *Cornelius* is misplaced. These cases have no application to the prison setting. As stated above, *Turner* sets forth the law for determining the constitutionality of a prison regulation and the County Jail's policy banning receipt of "sexually explicit material" and "technical publications" satisfies *Turner*.[7]

The jail's ban on inmate access to "sexually explicit material" and "technical publications" is expressly aimed at advancing jail security and the ban on "sexually explicit material" also protects the safety of jail personnel and other inmates.[8] Prison security and safety are legitimate governmental objectives. *See*

---

[7] The Second Circuit does not apply *Turner* to *jail* regulations, limiting it to *prison* regulations. *See Iqbal v. Hasty*, 490 F.3d 143, 170-72 (2d Cir. 2007); *Shain v. Ellison*, 273 F.3d 56, 65 (2d Cir. 2001). We, as well as other circuits, have not made such distinction and have routinely applied *Turner* to jail regulations. *See*, *e.g.*, *Mauro v. Arpaio*, 188 F.3d 1054, 1058-59 (9th Cir. 1999); *Barney v Pulsipher,* 143 F.3d 1299, 1313 n.17 (10th Cir. 1998); *Bedford v. Sharp,* 120 F.3d 270, No. 96-6230, 1997 WL 413166, at *1-2 (10th Cir. July 23, 1997) (unpublished); *Siddiqi v. Leak*, 880 F.2d 904, 908-10 (7th Cir. 1989). The parties have not argued otherwise.

[8] Lieutenant Merrick testified: "We have a fair amount of sexual assaults that occur in jail already, and sexually explicit material may inflame a prisoner, excite a prisoner, perhaps assault another prisoner, force him to perform a sex act." (R. Appellant's App. Vol. 1 at 223.)

*Thornburgh*, 490 U.S. at 415 (prison security is a legitimate governmental purpose "central to all other corrections goals") (quotations omitted); *Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. 1999) ("[T]here is no doubt that protecting the safety of guards in general is a legitimate interest, and that reducing sexual harassment in particular . . . is legitimate."). The ban is rationally related to these objectives. Further, despite the ban on "sexually explicit material" and "technical publications," the jail's regulations allow a broad range of publications to enter the facility. *Thornburgh*, 490 U.S. at 418 ("As the regulations at issue . . . permit a broad range of publications to be sent, received, and read, [the second *Turner* factor] is clearly satisfied."). Indeed, the ban on "sexually explicit material" does not prohibit sexually explicit prose or pictures of clothed women/men.[9] *Mauro*, 188 F.3d at 1061 (finding second *Turner* factor met where prison regulation did not ban sexually explicit letters between inmates and others or sexually explicit articles or photographs of clothed females). Moreover, to allow inmates to possess "sexually explicit material" and "technical publications" concerning

___

[9] In his brief, Jones alleges Captain Glad testified the ban on "sexually explicit material" included written descriptions of sexual acts or conduct. The record reference for this statement is Jones' reply to the County Defendants' response to his objections to the magistrate's report and recommendation. Because Jones failed to include a transcript of Glad's testimony in the record, we decline to consider it. It appears other potentially relevant and helpful testimony and trial court documents concerning these appeals could have been, but was not, included in the parties' appendices. Because the parties failed to include these items, we will not consider them in our discussion. *See* 10TH CIR. R. 30.1(A)(3) ("The court need not remedy any failure of counsel to provide an adequate appendix.").

weapons, contraband and escapes would have a significant impact on the safety and security of prison personnel and other inmates. Lastly, Jones points to no alternative that fully accommodates his rights while at the same time imposing *de minimis* cost to valid penological interests. Therefore, the jail's ban on "sexually explicit material" and "technical publications" passes constitutional muster.

B. Paperback books

The County Jail prohibits inmates from possessing hardback books and ordering paperback books from the outside. Jones does not contest the jail's ban on hardback books. He does, however, challenge the paperback book policy. Under that policy, inmates can obtain paperback books through the jail library, which contains thousands of books.[10] The jail librarian pushes a book-laden cart through the jail "[a]s often as [she] can." (R. Appellant's App. Vol. 1 at 241.) An inmate is permitted to select four books from the cart each time the librarian visits his cell.[11] (An inmate is allowed to possess no more than four books in his cell at one time.) In addition to obtaining books from the jail library, an unwritten rule allows inmates to seek permission to order a paperback book from a publisher. Captain Glad testified such requests would be granted if reasonable, which turned on the jail's safety and security needs. Specifically, he stated he

---

[10] Lieutenant Merrick testified inmates can obtain books from the jail library as well as the Salt Lake County Library System. However, the jail's librarian testified inmates cannot receive books from the County Library System.

[11] Jones admitted the jail's librarian obtained specific books for him.

approved every request that did not pose a threat to another person.

Starting in April or May 1996, inmates could also obtain paperback books from the local Barnes & Noble bookstore under a "Public Donation Procedure." (R. Appellant's App. Vol. 1 at 236.) The procedure permits "interested parties . . . to make monetary gifts and donations of materials to the jail library collections." (*Id.*) It also allows parties to make book donations to a specific prisoner. Donations to specific prisoners are required to be purchased through the local Barnes & Noble bookstore and must meet the jail library's selection guidelines.[12] Once the book is ordered, the jail librarian picks up the book and delivers it to the inmate. Under this policy, all book donations, whether to the jail library or to a specific prisoner, "become the immediate property of the jail librar[y]." (*Id.*)

Jones claims the jail's paperback book policy is unconstitutional. He asserts inmates have a constitutional right to purchase books from publishers, book clubs and bookstores. He asserts the jail's unwritten and unpublicized rule "allowing some inmates to purchase some books some times" does not comport with the First Amendment. (Appellant Jones' Reply Br. at 16.) He also contends the jail's policy that paperback books purchased by and shipped to inmates from Barnes & Noble become the jail's property violates due process.

In *Bell v. Wolfish*, the Supreme Court addressed a rule at the Metropolitan

---

[12] In November 1996, the jail's librarian was in the process of creating those guidelines.

Correctional Center (MCC) which permitted inmates to receive hardback books from outside the institution only if they were mailed directly from the publisher, a bookstore or a book club, *i.e.*, a "publisher-only rule." 441 U.S. 520, 549-50 (1979) (quotations omitted). It concluded the publisher-only rule for hardback books did not violate the First Amendment. *Id.* at 550. Although *Turner* had not yet been decided, the Court essentially applied its factors. *Id.* at 550-51. It stated the rule was a rational response to an obvious security problem as hardback books could be used to smuggle contraband into the prison, are hard to search effectively and allowance of them from any source would impose an administrative burden on prison staff to carefully inspect each book. *Id.* at 550-51. The Court also considered the following factors: (1) the rule operates in a neutral fashion without regard to the content of the expression; (2) the brief terms of confinement for most inmates at the facility (which was mainly a pre-trial detention center); and (3) inmates had alternative means of obtaining reading material, specifically, (a) hardback books could be received from publishers, bookstores and book clubs, (b) magazines and paperback books could be obtained from any source and (c) the facility had a relatively large library for use by inmates. *Id.* at 551-52.

While *Bell's* holding is limited to hardback books, several circuits have extended it to paperback books and magazines. For example, in *Kines v. Day*, the First Circuit addressed a prison rule allowing inmates to receive newspapers and

hardback and paperback books only from a book club, bookstore or news store but allowed the superintendent of the prison to permit visitors to bring in paperback books. 754 F.2d 28, 29 (1st Cir. 1985). Relying on *Bell*, the court upheld the rule. *Id.* at 29-30. While recognizing that *Bell* considered only hardback books, the court concluded many of the security issues posed by hardback books also applied to paperback books. *Id.* at 30. It also determined inmates had alternative means of obtaining reading material, in particular, the prison had a library with an inter-library loan procedure and the regulation itself provided an exception for visitors. *Id.*; *see also Ward v. Washtenaw County Sheriff's Dep't*, 881 F.2d 325, 328-30 (6th Cir. 1989) (upholding publisher-only rule as applied to magazines); *Hurd v. Williams*, 755 F.2d 306, 307-09 (3d Cir. 1985) (upholding publisher-only rule as applied to newspapers, periodicals and paperback books where plaintiff failed to refute warden's affidavit justifying rule); *Cotton v. Lockhart*, 620 F.2d 670, 671 (8th Cir. 1980) (upholding publisher-only rule as applied to hardback and paperback books, magazines and newspapers); *but see Keenan v. Hall*, 83 F.3d 1083, 1093 (9th Cir. 1996) (suggesting a publisher-only rule as applied to books, magazines and newspapers may violate the First Amendment); *Pratt v. Sumner*, 807 F.2d 817, 819-20 (9th Cir. 1986) (finding prisoner's complaint challenging prison's publisher-only rule for paperback and hardback books was not frivolous).

We conclude the County Jail's paperback book policy, which allows

inmates to obtain paperback books from the jail library and, with permission, the publisher, is rationally related to the legitimate governmental objective of prison security.[13] Allowing inmates to purchase paperback books only from the publisher prevents contraband from being smuggled into the jail and lessens the administrative burden on jail personnel who must inspect each book. Inmates also have alternative means of obtaining reading material because they can obtain books from the jail library and are permitted to have newspapers and certain magazines. After April/May 1996, inmates could also receive donated books from the local Barnes & Noble bookstore. The fact these books automatically become the jail's property is irrelevant; purchasers are warned the books will automatically become jail property, which is consistent with the fact it is a

---

[13] The fact the jail's publisher-only paperback book policy was unwritten and unpublicized is irrelevant to our analysis. We have found no cases, and Jones points to none, requiring prison regulations to be written and publicized in order to meet constitutional requirements. Rather, the constitutionality of a prison regulation, whether written, unwritten, publicized or unpublicized, is governed by *Turner*. Indeed, we and other circuits have applied *Turner* to unwritten prison policies and other prison actions. *See Frazier v. Dubois*, 922 F.2d 560, 562 (10th Cir. 1990) ("Although *Turner* addresses prison rules and regulations, we see no reason why the *Turner* principle should not apply to other prison actions, such as the transfer here."); *see also Victoria W. v. Larpenter*, 369 F.3d 475, 479, 483-86 (5th Cir. 2004) (applying *Turner* to unwritten prison policy requiring inmates who wish to obtain an elective medical procedure to obtain a court order); *Shimer v. Washington*, 100 F.3d 506, 508-10 (7th Cir. 1996) (applying *Turner* to unwritten policy prohibiting prison employees from writing Prison Review Board directly); *Cornwell v. Dahlberg*, 963 F.2d 912, 917 (6th Cir. 1992) (noting *Turner* "has been applied to unwritten prison policies as well as prison regulations"); *c.f. Faustin v. City & County of Denver, Colo.*, 423 F.3d 1192, 1196 n.1 (10th Cir. 2005) ("Our precedent allows [First Amendment] facial challenges to unwritten policies.").

donation policy.[14]  The jail's paperback book policy also satisfies the third and fourth *Turner* factors.  To allow inmates to possess paperback books from non-publishers would have a significant impact on jail resources.  Lastly, we see no indication the policy is an "exaggerated response" to the jail's concerns.

The County Jail's paperback book policy is constitutional.

C.  Catalogs

As stated above, the County Jail bans all catalogs.  Lieutenant Merrick testified catalogs are banned for "space, health and safety" reasons.  (R. Appellant's App. Vol. 1 at 220.)  Jones argues the jail's catalog ban is unconstitutional as it furthers no legitimate penological interest and any such interest could be accomplished with less restrictive alternatives such as making select retail catalogs available to inmates or allowing them to request them.  He also claims there should at least be an exception for catalogs offering reading materials so inmates can order reading materials from the outside.

Relying on *Berger v. White*, an unpublished case, and without conducting a *Turner* analysis, the magistrate concluded a ban on catalogs failed to raise an issue of constitutional magnitude.  12 Fed. App. 768 (10th Cir. 2001) (unpublished).  The district court adopted this conclusion.  In *Berger*, the plaintiff

---

[14] Because books purchased from Barnes & Noble automatically become jail property, the inmates do not have a property interest in the books.  Therefore, due process is not implicated and Jones' due process argument fails.  *See Lancaster v. Indep. Sch. Dist. No. 5*, 149 F.3d 1228, 1234 (10th Cir. 1998).

alleged jail employees violated his First Amendment rights by returning a catalog

to the sender on the ground it was not pre-approved. We concluded: "[A]

'complaint about undelivered catalogues fails to raise an issue of constitutional

magnitude.'" *Id.* at 771 (quoting *Smith v. Maschner*, 899 F.2d 940, 944 (10th Cir.

1990)); *see also Foster v. Nelson*, 153 F.3d 727, No. 98-3069, 1998 WL 422030,

at *1 (10th Cir. 1998) (unpublished) (rejecting inmates' claim that prison officials

violated his First and Fourteenth Amendment rights by failing to deliver certain

commercial catalogs featuring automotive racing and airplane parts which had

been sent to him in the mail).

At first blush, *Berger*, *Smith* and *Foster* may seem to support the jail's total

ban on catalogs. However, none of them involved a challenge to a prison

regulation and none applied *Turner*. Rather, these cases were limited to a prison

official's one-time failure to deliver catalogs to an inmate. Here, Jones is not

challenging the constitutionality of the County Jail's failure to deliver mail but

rather the constitutionality of its mail regulations. Thus, these cases do not

control and a *Turner* analysis is necessary.

It appears Jones has not met his burden under *Turner* to establish the jail's

catalog ban is unconstitutional. *See Wirsching v. Colorado*, 360 F.3d 1191, 1200

(10th Cir. 2004) (noting that the burden is not on the state to prove the validity of

a prison regulation, but rather on the prisoner to disprove it). "Space, health and

safety"[15] are legitimate and neutral penological interests and the catalog ban is rationally related to those interests—these factors weigh in favor of the constitutionality of the ban. Jones makes no mention of either the second or third *Turner* factors—whether there is an alternative means of exercising his right to receive printed materials and the impact of accommodating the right on guards, other inmates, and jail resources. Regarding the fourth *Turner* factor, Jones does mention a few alternatives to a total ban, but nowhere does he provide evidence that these alternatives come with only *de minimus* costs to the interests of jail administrators and guards. For example, Jones mentions that one alternative would be to permit an inmate to possess only one catalog at a time and a screening process could be used to enforce the rule. But Jones fails to argue—let alone provide evidence—that such a screening process would not unduly burden jail resources. Similarly, Jones suggests the jail could allow inmates to seek permission to obtain a catalog. Again, however, this would require officials to consider such requests on a case-by-case basis and Jones does not offer any evidence or argument that such a process might be implemented with only *de minimus* costs.[16] These observations aside, the district court did not conduct a

---

[15] Lieutenant Merrick did not elaborate on the meaning of "space, health and safety." It appears Captain Cunningham submitted an affidavit expounding on the jail's justifications for the catalog ban. However, this affidavit was not included in the appellate record and we decline to consider it.

[16] Our case law is not to the contrary. In *Allen v. Deland*, for example, we upheld a prison regulation that prohibited prisoners from receiving mail-order

*Turner* analysis and it should be afforded that opportunity in the first instance. Therefore, we remand to the district court to evaluate the jail's catalog ban under *Turner*.

### III. Appeal No. 04-4186 (*Prisoner's Legal News v. Haun, et al.*)

PLN is a non-profit Washington corporation which publishes and distributes Prison Legal News, a monthly magazine containing news articles regarding inmate litigation, including litigation trends and recent court decisions. As a non-profit organization, PLN has been granted I.R.S. § 501(c)(3) status by the Internal Revenue Service. *See* 26 U.S.C. § 501(c). Based on that status, the United States Postal Service has authorized PLN to send its magazines using the Non-Profit Organization rate, often referred to as bulk-rate.

---

catalogs. 42 F.3d 1406, No. 94-4067, 1994 WL 593917, at *1-2 (10th Cir. Oct. 26, 1994) (unpublished). In making this determination, we concluded: (1) the prohibition served a legitimate interest and (2) other alternatives existed that allowed inmates to receive printed material. *Id.* But we did not hold that the prohibition would have been unconstitutional *but for* the existence of other alternatives. Similarly, in *Dixon v. Kirby*, the Southern District of West Virginia also concluded that a prohibition on inmates receiving catalogs passed constitutional muster under *Turner*. 210 F. Supp. 2d 792, 794, 800-01 (S.D. W. Va. 2002). In that case, each of the four *Turner* factors weighed in favor of the state, with the court noting that the prison provided an alternate method of receiving catalogs because catalogs were available at the commissary. *Id.* at 800-01. Again, however, the court did not conclude that the existence of an alternative *per se* validated the regulation, nor did it conclude that the regulation would have been unconstitutional had prison officials not made catalogs available at the commissary. It is Jones's burden to establish the unconstitutionality of the jail's catalog ban, and although he has pointed to a few alternatives to the ban, he has not demonstrated that the alternatives could be easily implemented and he has not meaningfully addressed the other three *Turner* factors.

-24-

In March 1996, several issues of Prison Legal News were returned to PLN from the Utah Department of Corrections (UDOC) marked "Return to Sender/Contents Not Authorized" and stamped "REFUSED." (R. Appellant's App. Vol. 2 at 623.) PLN wrote to the UDOC concerning the problem. At the bottom of this letter, it wrote "cc: Jason Cohen #23651." (*Id.*) On April 17, 1996, Bryant Herman, the UDOC's Mail/Property Supervisor, responded to PLN's letter. This letter stated in relevant part:

> I will address the issues specific to inmate Cohen because I don't have other names to research those cases individually. For your monthly magazine to be refused, it would have to [have] been sent bulk rate mail. Generally, bulk rate mail is not accepted. If your magazine was sent bulk rate mail and/or "Address Correction Requested" to the Draper Facility and the inmate housed was at the Gunnison Facility (Cohen is housed at the Gunnison Facility), the magazine would have been returned to the sender. The US Postal Service will not forward Bulk Rate mail . . . .
> To avoid any further problems, you may wish to send your magazines some other way than bulk rate mail.

(*Id.*)

In early 1998, Walter Thomas, an inmate at the Utah State Prison in Draper, Utah, received a paid subscription for Prison Legal News. On February 26, 1998, the March 1998 edition of Prison Legal News was mailed to Thomas at the prison. Thomas never received it and it was never returned to PLN. On March 19, 1998, the April 1998 edition of Prison Legal News was mailed to Thomas at the prison. It was returned to PLN stamped: "RETURN TO SENDER," "BULK RATE MAIL NOT ACCEPTED AT UT STATE PRISON"

-25-

and "REFUSED." (R. Appellant's App. Vol. 2 at 558.) According to Kerry Galetka, the State Prison's mail unit supervisor since 1991, the prison's mailroom attempted to deliver the April 1998 edition of Prison Legal News to Thomas. However, the mailroom erroneously and inadvertently believed Thomas was housed in Uintah 5, where inmates are not allowed to have subscriptions.[17]

On April 23, 1998, PLN and Thomas filed suit against Pete Haun (Executive Director of the UDOC), Fred Vanderveur (Director of Institutional Operations at the UDOC) and John Does I and II, later named as Herman and Galetka. They alleged the State Prison's bulk-rate mail regulations between July 30, 1987, and May 15, 1998, violated the First and Fourteenth Amendments of the United States Constitution. The magistrate recommended dismissal, concluding the bulk-rate mail regulations were constitutional because they allowed authorized subscriptions under the publisher-only rule and non-profit mailings. He also found Thomas' claims could be dismissed for failure to exhaust his administrative remedies. PLN and Thomas conceded Thomas' federal claims could be dismissed

---

[17] Other prisoners with subscriptions to Prison Legal News have also not received certain issues. Roy Don Juan Droddy and Richard Swart were to receive Prison Legal News from November 1997 to April 1998. Droddy only received the December 1997 and January 1998 editions; Swart never received the February 1998 edition. Aaron Lee Curtis and Eric Lee Piper did not receive their May 1998 editions of Prison Legal News. They were returned to PLN bearing stamps similar to those appearing on Thomas' April 1998 edition. According to Galetka, Curtis and Piper did not receive the May 1998 editions because they were no longer housed at the State Prison and had not been there since 1991 and 1993, respectively. Because the United States Postal Service and the State Prison do not forward bulk-rate mail, the prison mail room returned the magazines to PLN.

for failure to exhaust. However, PLN objected to the magistrate's conclusion that the bulk-rate mail regulations were constitutional. The district court adopted the magistrate's recommendation.

PLN argues the court erroneously found the State Prison's bulk-rate mail regulations constitutional. It contends the State Prison informed PLN by letter it would not deliver editions of Prison Legal News if mailed to inmates by bulk-rate mail. It also claims the prison rejected editions of Prison Legal News in 1998 simply because they were mailed bulk-rate without considering whether they were authorized subscriptions. PLN argues the prison's rejections of specific editions of Prison Legal News state a cause of action, as well as its claim that the prison allowed its mail room employees complete and unfettered discretion to reject bulk-rate mail. PLN also challenges the prison's policy to not provide notice to the sender when its bulk-rate mail is refused.

Between July 30, 1987, and May 15, 1998, the State Prison had two different bulk-rate mail regulations in effect.[18] From July 30, 1987, to December 16, 1997, the bulk-rate mail regulation provided: "Bulk-rate mail shall be refused except for authorized subscriptions" and "Bulk-rate mail shall be refused.

_____

[18] In the district court, PLN referred to three bulk-rate mail regulations in effect between July 30, 1987, and May 15, 1998: (1) the regulation in effect from July 30, 1987, to December 16, 1997, (2) the regulation in effect from December 17, 1997, to February 28, 1998, and (3) the regulation in effect from March 1, 1998, to May 15, 1998, referred to as Exhibits X, Y and Z, respectively. Because Exhibits Y and Z are, in all relevant respects, the same, we refer to two regulations.

Exceptions shall include, but are not limited to, non-profit as listed in the [United States Postal Service Domestic Mail Manual] and subscription material as defined under the publisher-only rule."[19]  (R. Appellant's App. Vol. 2 at 631-32.)  The regulation did not define "authorized subscriptions" but defined the publisher-only rule as "a rule limiting books, cassette tapes, magazines, newspapers, etc[.] to those sent directly from the publisher, a book or tape club or a licensed book store; . . ." (*Id.* at 629.)  From December 17, 1997, to May 15, 1998, the prison's bulk-rate mail regulation stated:  "Bulk-rate mail may be refused.  Exceptions include, but are not limited to, religious mail, non-profit mail as listed in the [United States Postal Service Domestic Mail Manual], and subscription material as defined under the Publishers-Only Rule."  (*Id.* at 643, 656)  The publisher-only rule remained the same.

PLN has a First Amendment interest in providing its magazine to inmates who subscribe to it.  *Thornburgh*, 490 U.S. at 408 ("[P]ublishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners.").  However, PLN's claim fails because it was defendants' negligence, as opposed to the prison's bulk rate-mail regulations, which caused its injuries.  Because Prison Legal News is a paid subscription and non-profit mail, the prison's bulk-rate mail

---

[19] At all relevant times, bulk-rate mail was defined as "a large mass or volume of mail sent at a set rate of postage (for this policy referring to only 3rd and 4th class bulk mailings)."  (R. Appellant's App. Vol. 2 at 628, 637, 651.)

regulations did not apply to it. Galetka testified that because <u>Prison Legal News</u> is a paid subscription and non-profit mail, the prison normally delivers it to inmates. The fact certain editions of <u>Prison Legal News</u> were not delivered to Thomas and other inmates was the result of human error or the fact the inmate was no longer housed at the State Prison.[20] Such negligence does not state a § 1983 claim. *Jojola v. Chavez*, 55 F.3d 488, 490 (10th Cir. 1995) ("Liability under § 1983 must be predicated upon a *deliberate* deprivation of constitutional rights by the defendant, and not on negligence.") (quotations omitted); *Woodward v. City of Worland*, 977 F.2d 1392, 1399 (10th Cir. 1992) ("The Supreme Court has made it clear that liability under § 1983 must be predicated upon a *deliberate* deprivation of constitutional rights by the defendant. It cannot be predicated upon negligence.") (quotations and citations omitted); *see also Smith*, 899 F.2d at 944 (finding prison official's opening of inmate's legal mail by accident did not give rise to a constitutional violation because it was an isolated incident and there was no evidence of improper motive or resulting interference with the inmate's right to counsel or access to courts).

PLN's due process claim suffers the same fate. While we recognize both inmates and publishers have a right to procedural due process when publications are rejected, *Jacklovich v. Simmons*, 392 F.3d 420, 433 (10th Cir. 2004), *Jacklovich*

---

[20] We reject PLN's claim that the mailroom acted intentionally in failing to deliver certain editions of <u>Prisoner Legal News</u> to Thomas and other inmates. There is absolutely no evidence supporting this claim.

-29-

involved the prison's deliberate rejection of publications pursuant to policy. Here, the prison's rejections of PLN's magazines was unintentional based on the negligence of its mailroom personnel. Therefore, due process is not implicated. *Daniels v. Williams,* 474 U.S. 327, 328 (1986) ("[T]he Due Process Clause [of the Fourteenth Amendment] is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property.").

## IV. Conclusion

We construe the district court's dismissal of Jones and PLN's complaints as a sua sponte grant of summary judgment to the County Defendants and Haun Defendants. In Appeal No. 04-4185, we AFFIRM the grant of summary judgment to the County Defendants concerning the County Jail's paperback book policy and its regulations banning inmate access to sexually explicit and technical publications but REVERSE as to the jail's catalog ban. We REMAND to the district court to evaluate the jail's catalog ban under *Turner*. In Appeal No. 04-4186, we AFFIRM the grant of summary judgment to the Haun Defendants.