**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 26, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT
_____

ERIK KHAN,

     Plaintiff - Appellant,

v.

CHRIS BARELA; BOARD OF COUNTY
COMMISSIONERS OF DONA ANA
COUNTY; ARAMARK CORPORATION;
CORIZON MEDICAL SERVICES; ELVA
BRIGHT; BILL STICKLES; JOHN DOE
(BEAM); JASON DURAN; TAMMY
RUSH,

     Defendants - Appellees.

No. 19-2056
(D.C. No. 2:15-CV-01151-MV-SMV)
(D. N.M.)

_____

## ORDER AND JUDGMENT[*]
_____

Before **MATHESON**, **KELLY**, and **PHILLIPS**, Circuit Judges.
_____

Erik Khan, a federal prisoner proceeding pro se, appeals the district court's

sua sponte dismissal with prejudice of an action he brought under 42 U.S.C. § 1983

and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

§§ 2000cc to 2000cc-5. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand for further proceedings.

## I. **Background**

Khan's action arises from his detention at the Doña Ana County Detention Center (DACDC) in Las Cruces, New Mexico. Except for several absences ranging from a few weeks to a couple of months, Khan was a federal pretrial detainee at the DACDC between May 2012 and June 2016. He filed his initial complaint in 2015. Finding that complaint "vague, ambiguous, redundant, and immaterial," R. at 84, the district court struck it and ordered Khan to file an amended complaint. Khan did so, but the district court struck that complaint, too, and gave Khan the opportunity to try again.

Khan then filed a second amended complaint (SAC), which is the operative pleading in this appeal, asserting seventeen "counts" and seeking only compensatory and punitive damages.[1] Khan listed the following defendants: Chris Barela, the DACDC Director; the Doña Ana County Board of County Commissioners; two DACDC chaplains, Bill Stickles and "John Doe" Beam; Aramark Corporation, the food-services provider; Corizon Medical Services, the mental-health-treatment provider; Elva Bright, a Corizon nurse; Jason Duran, Corizon's health-services administrator; and Tammy Rush, Corizon's director of nursing. The district court

---

[1] By the time Khan filed his SAC, he was no longer detained at the DACDC but was in the custody of the United States Bureau of Prisons in New Jersey, apparently because he had been sentenced on his federal charges. This perhaps explains why he did not seek injunctive or declaratory relief.

2

ruled that none of the counts in the SAC stated a claim for relief and therefore dismissed the action with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). Khan appeals.

## II. **Standard of review**

We review a dismissal under § 1915(e)(2)(B)(ii) de novo, applying the same standard of review we use for dismissals under Federal Rule of Civil Procedure 12(b)(6). *Kay v. Bemis*, 500 F.3d 1214, 1217 (10th Cir. 2007). As discussed in Part III of this decision, all of Khan's claims within the scope of this appeal arise under § 1983. Therefore, his SAC "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Accordingly, the SAC must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" as to the specific constitutionally impermissible actions allegedly committed by each named defendant. *Id.* at 678 (internal quotation marks omitted). "Conclusory allegations are not enough . . . ." *Gallagher v. Shelton*, 587 F.3d 1063, 1068 (10th Cir. 2009).

"Dismissal of a pro se complaint for failure to state a claim is proper only where it is obvious that the plaintiff cannot prevail on the facts he has alleged and it would be futile to give him an opportunity to amend." *Kay*, 500 F.3d at 1217 (internal quotation marks omitted). The district court did not explicitly address futility of amendment (a procedural fact Khan takes issue with), but futility is a question of law we review de novo, *Cohen v. Longshore*, 621 F.3d 1311, 1314-15

3

(10th Cir. 2010). We will not, however, "conjure facts [Khan] might conceivably raise in support of his claims," particularly because Khan "made no appropriate effort in the district court to seek amendment," such as through a Rule 59 or Rule 60 motion seeking leave to amend. *Requena v. Roberts*, 893 F.3d 1195, 1205-06, 1208 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 800 (2019). Because Khan represents himself, we afford his filings a liberal construction but do not act as his advocate. *Yang v. Archuleta*, 525 F.3d 925, 927 n.1 (10th Cir. 2008).

### III. **Scope of appeal**

We find it necessary to describe the scope of this appeal. Khan concedes that counts not specifically addressed in his appellate brief fail to state a claim for relief. Aplt. Br. at 32. Those claims are Counts 1 and 2 (facial challenges to thirteen alleged policies at the DACDC), 14 (deprivation of dental floss), 15 (inadequate mattress, no pillow), and 16 and 17 (intertwined claims regarding access to the courts and legal counsel). He has therefore waived appellate review of the dismissal of those counts. *See State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994) (explaining that issue not raised in opening brief is waived).[2] Accordingly, we affirm the dismissal of Counts 1, 2, 14, 15, 16, and 17.

---

[2] Khan asks us to use these waived claims to "build on the unconstitutional pretrial punishments claim" and "to support the claims that do state claims." Aplt. Br. at 32. But we can discern no discrete "unconstitutional pretrial punishments" claim in his SAC. As we discuss in Part IV of this decision, the analysis of a pretrial detainee's constitutional claims occurs within a punishment framework. And with two exceptions, nothing in the waived claims would alter our analysis of his preserved claims. The two exceptions are some of the allegations in Counts 1 and 2,

In Count 9, Khan asserted that certain defendants violated RLUIPA when they (1) refused to allow him to access or possess a clock, a prayer schedule, and a Muslim calendar; and (2) served him a special Ramadan meal of ham and bread. But for all his claims, Khan sought only damages. RLUIPA, however, is limited to official-capacity claims for equitable relief. *See Sossamon v. Texas*, 563 U.S. 277, 280 (2011) (holding Eleventh Amendment immunity bars RLUIPA claims for money damages); *Stewart v. Beach*, 701 F.3d 1322, 1335 (10th Cir. 2012) (holding "that there is no cause of action under RLUIPA for individual-capacity claims"). Consequently, RLUIPA is unavailable to Khan in this action for damages. We therefore affirm the district court's dismissal of Count 9.

## IV. **Legal framework for constitutional claims of pretrial detainees**

Before considering each of the preserved claims, it is helpful to review the legal framework for analyzing constitutional claims a pretrial detainee like Khan

---

which Khan incorporated into his other counts. As explained below, certain allegations in those counts bear on our consideration of other counts.

Furthermore, despite specifically conceding the implausibility of his court-access claim, *see* Aplt. Br. at 34, Khan argues that if permitted to further amend his complaint, he would allege that he lost his ability to bring a case in state court, which involved "numerous tort claims against various state actors," "because he was not aware of the requirement that he [had] time constraints, that are now lapsed," *id.* We reject this argument. As the district court discussed, that case was dismissed for failure to prosecute, *see* R. at 677, and Khan offers insufficient details regarding how any of the defendants caused that case to founder or whether it involved any non-frivolous claims. *See Gee v. Pacheco*, 627 F.3d 1178, 1191 (10th Cir. 2010) (explaining that for a plausible court-access claim regarding conditions of confinement, a prisoner must demonstrate that any alleged interference with access to the courts "frustrated or impeded his efforts to pursue a nonfrivolous legal claim").

5

brings against state actors. Because pretrial detainees in state custody have not been adjudicated guilty, they have a right under the Fourteenth Amendment's Due Process Clause not to be punished. *Bell v. Wolfish*, 441 U.S. 520, 535 & n.16 (1979). Courts must therefore decide whether a condition or restriction of pretrial detention "is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538. A detainee can establish unconstitutional pretrial punishment upon "a showing of an expressed intent to punish on the part of detention facility officials." *Id.* Although detention-facility officials cannot "justify punishment," *id.* at 539 n.20, a restriction or condition that "is reasonably related to a legitimate governmental objective . . . does not, without more, amount to punishment," *id.* at 539 (internal quotation marks omitted). But a court may infer an intent to punish "if a restriction or condition is not reasonably related to a legitimate governmental goal—if it is arbitrary or purposeless." *Id.*

## V. **Discussion of preserved claims**

A. **Count 3 (prohibition on hardcover books, newspapers, and newspaper clippings)**

In Count 3, Khan alleged that defendants Barela, the Board, and Aramark deprived him of his First Amendment free-speech right to read hardcover books, newspapers, and newspaper clippings. Specifically, he alleged that pursuant to unwritten jail policy,[3] these defendants kept him from receiving a *USA Today*

---

[3] The fact that a jail policy is unwritten "is irrelevant" to an analysis of its constitutionality. *Jones v. Salt Lake Cty.*, 503 F.3d 1147, 1158 n.13 (10th Cir. 2007).

subscription, a newspaper clipping his mother sent him, and a hardcover book on the application of the U.S. Sentencing Guidelines.

The district court never properly addressed the plausibility of this claim. The court included it with an analysis of six *Eighth* Amendment claims and cited no relevant case law. *See* R. at 663-67. As we proceed to discuss, Khan plausibly alleged a First Amendment violation.

Khan contends he stated a claim under the general rule set forth in *Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004): "Inmates have a First Amendment right to receive information while in prison to the extent the right is not inconsistent with prisoner status or the legitimate penological objectives of the prison." Khan observes that because defendants were never served, there is no occasion to conduct the four-factor *Turner*[4] test used to determine the reasonableness of a prison regulation that impinges on an inmate's constitutional rights. And Khan contends he adequately alleged that the prohibition on all access to or possession of hardcover

---

[4] In *Turner v. Safley*, 482 U.S. 78, 89-91 (1987), the Supreme Court identified four factors relevant to determining whether a prison regulation is reasonably related to a legitimate penological interest. The factors are:

> (1) whether a rational connection exists between the prison policy regulation and a legitimate governmental interest advanced as its justification; (2) whether alternative means of exercising the right are available notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights.

*Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002).

7

books, newspapers, or newspaper clippings was not reasonably related to any legitimate penological interest but was the product of an arbitrary policy.

As to *Turner*'s application, Khan is correct: "[A]n analysis of the *Turner* factors is unnecessary at the pleading stage." *Al-Owhali v. Holder*, 687 F.3d 1236, 1240 n.2 (10th Cir. 2012). But "[b]ecause *Turner* allows prohibitions and restrictions that are reasonably related to legitimate penological interests, [an inmate] must include sufficient facts to indicate the plausibility that the actions of which he complains were *not* reasonably related to legitimate penological interests." *Gee v. Pacheco*, 627 F.3d 1178, 1187-88 (10th Cir. 2010). An inmate need not "identify every potential legitimate interest and plead against it." *Id.* But he must "plead facts from which a plausible inference can be drawn that the action was not reasonably related to a legitimate penological interest." *Id.* Doing so might require the inmate to "recite[] facts that might well be unnecessary in other contexts. For example, . . . a prisoner claim may not be plausible unless it alleges facts that explain why the usual justifications for the complained-of acts do not apply." *Id.* at 1185.

Under this rubric, the question is whether Khan alleged sufficient facts to plausibly suggest the asserted prohibitions, the application of which resulted in the specific deprivations he seeks damages for, are *not* reasonably related to a legitimate penological interest. Relevant to this inquiry are allegations in Counts 1 and 2, incorporated by reference into Count 3 (and all other counts), that Barela imposed restrictions on these items as part of an effort to force detainees to plead guilty to their crimes rather than defend on the merits, and that Barela disregarded the opinion

8

of the Doña Ana County Attorney that the policy was unconstitutional.  Khan also alleged that defendants did not allow exceptions to the policy and afforded no alternative and reasonable means of enjoying the right to read newspapers, their clippings, or hardcover books.  When measured against one of the "usual justifications," *Gee*, 627 F.3d at 1185, for prison restrictions on hardcover books and newspapers, these allegations are sufficiently plausible to show the prohibition on hardcover books and newspaper resulted from "an expressed intent to punish on the part of detention facility officials," *Wolfish*, 441 U.S. at 538, rather than a reasonable response to a legitimate penological concern, *see Gee*, 627 F.3d at 1188 (explaining that "there is no legitimate penological reason to restrict mail simply to harass inmates").  We briefly consider one obvious "usual justification" regarding hardcover books and newspapers, then consider newspaper clippings.

In *Wolfish*, the Supreme Court upheld a "publishers only" policy that allowed pretrial detainees to receive hardcover books only when shipped from the publisher, a bookstore, or a book club.  441 U.S. at 549-50.  The Court concluded that the rule was "a rational response by prison officials to an obvious security problem"— smuggling contraband into the prison in such books, which "are difficult to search effectively"—and therefore did not violate the detainees' First Amendment rights. *Id.* at 550-51.  And in *Jones v. Salt Lake County*, we upheld a similar "publishers only" rule with regard to paperback books against a First Amendment challenge for the same reasons stated in *Wolfish*—it prevented contraband from being smuggled

into the jail and lessened the administrative burden to search paperback books.

503 F.3d 1147, 1158 (10th Cir. 2007).

The implication of *Wolfish* and *Jones* is that a complete ban on hardcover

books or newspapers would likely violate the First Amendment.[5]  In other words,

these cases show that one of the "usual justifications," *Gee*, 627 F.3d at 1185, for a

ban on hardcover books or newspapers—limiting contraband—is not reasonably

related to a restriction on hardcover books or newspapers sent by publishers.[6]

Defendants may be able to support this or other justifications for prohibiting Khan

from receiving the hardcover book or the newspaper subscription, but for pleading

purposes, Khan has done enough by alleging the existence of a blanket ban that could

be reasonably construed as an intent to punish rather than as a reasonable response to

a legitimate penological concern.

We also conclude that Khan plausibly alleged a First Amendment claim with

regard to the newspaper clipping his mother sent him.  Although involving part of a

---

[5] The rule in *Jones* also permitted receipt of newspapers "when mailed directly from the publisher," *Jones*, 503 F.3d at 1155 (quotation omitted), but we did not expressly discuss the rule in terms of newspapers.  We did, however, discuss with apparent approval extra-circuit cases (1) upholding publisher-only rules as applied to newspapers, (2) questioning the constitutionality of such a rule, and (3) finding a challenge to such a rule not frivolous.  *See id.* at 1158.  We therefore conclude that *Jones* may be applied to newspapers.

[6] We have no concern that Khan's request for a newspaper subscription would fall within the publishers-only rule, but he did not clearly allege that he ordered the hardcover book from a publisher, bookstore, or book club.  Due to his pro se status, however, we will give him the benefit of the doubt, and if necessary, he can remedy any doubt on the point after remand.

10

newspaper sent by a *non*-publisher, the justification in preventing contraband from such sources seems inapplicable. A newspaper clipping, likely comprising only part of one or two newspaper pages at most, may not be much different than a letter from a relative, which, presumably, the DACDC would not completely ban. Defendants may be able to legitimately justify prohibiting Khan from receiving the clipping his mother sent, but for pleading purposes, Khan has done enough by alleging the existence of a blanket ban that could be reasonably construed as an intent to punish rather than as a reasonable response to a legitimate penological concern.

B.    **Counts 4 and 5 (deprivation of adequate outdoor exercise and sunlight)**

In Counts 4 and 5, Khan alleged that for more than three years, DACDC policy allowed him to exercise outdoors only three days a week for a maximum of 2.5 hours per week, and that in their discretion, detention officers would provide outdoor exercise opportunities only during early morning hours when there was no sunlight. Khan, who had no health problems when he entered the DACDC, developed a Vitamin D deficiency with extreme joint pain, unusual mood shifts, muscle cramping, and headaches. He was treated with high-dose supplements, but his Vitamin D level remained very low. When he complained to a nurse-practitioner about the need for sunlight, she told him she could not order the detention officers to provide access to sunlight. Khan further alleged he was verbally reprimanded for attempting to jog around a small recreation area and was told he could only do pullups and walk. Because he was housed in a cell with four or five other detainees, there was no room in the cell to exercise.

11

By the time he left the DACDC, he was receiving treatment for high heart rate and blood pressure, severe joint pain, and back pain, all of which he attributed to the policy limiting exercise. Khan's health stabilized after he left DACDC because he had access to sunlight and was able to exercise regularly. Khan asserted that the alleged treatment violated the Eighth Amendment and the Due Process Clauses of the Fifth and Fourteenth Amendments.[7]

The district court resolved these Eighth Amendment claims, which Khan suggests are best-characterized as failure-to-protect claims, Aplt. Br. at 17, under the objective component of the two-part test of *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The *Farmer* test applies to such claims and requires an inmate to show

> (1) that the conditions of his incarceration present an objective substantial risk of serious harm and (2) prison officials had subjective knowledge of the risk of harm[;] in other words, an official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Requena,* 893 F.3d at 1214 (brackets and internal quotation marks omitted).[8]

---

[7] In each of his Eighth Amendment claims, Khan similarly relied on the Due Process Clauses of the Fifth and Fourteenth Amendments. We are not sure why he cites the Fifth Amendment, which "applies only to federal actors," *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2477 (2015) (Scalia, J., dissenting), because there appears to be no federal actors here.

[8] As noted above, "[p]retrial detainees are protected [against punishment] under the Due Process Clause rather than the Eighth Amendment," but "in determining whether [a detainee's] rights were violated, . . . we apply an analysis identical to that applied in Eighth Amendment cases." *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999). In *Kingsley*, 135 S. Ct. at 2473, the Supreme Court ruled that for a claim of excessive force, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." In this circuit, there is an open question whether, in light of *Kingsley*'s pronouncement

Applying this test, the district court resolved the claims on the objective component, ruling that the alleged conditions did not pose a substantial risk of serious harm to Khan's health or safety and that this court has recognized Eighth Amendment violations only in much more egregious circumstances. *See* R. at 665-67. The district court did not cite any cases concerning exposure to sunlight, and the only case relevant to exercise the court pointed to is *Fogle v. Pierson*, 435 F.3d 1252, 1259-60 (10th Cir. 2006), which held that an inmate's allegation that he had been deprived of *all* outdoor exercise for three years was sufficient to satisfy the subjective component of an Eighth Amendment claim. We will first address Count 5, the exercise claim, and then Count 4, the sunlight-deprivation claim.

1. **Exercise claim (Count 5)**

Khan's allegation that during a three-year-plus period he was allowed outdoors to exercise only three times per week and for a maximum of 2.5 hours per week fails to show an objectively substantial risk of serious harm. Khan cites no case establishing an Eighth Amendment violation for limiting outdoor exercise to 2.5 hours per week, nor are we aware of any. To the contrary, in *Bailey v. Shillinger*,

---

regarding excessive-force claims, the subjective component of the *Farmer* test applies to a pretrial detainee's claims regarding conditions of confinement and inadequate medical care. *See, e.g.*, *Burke v. Regalado*, 935 F.3d 960, 991 n.9 (10th Cir. 2019) (recognizing issue but declining to resolve it). We need not answer that question today because all of Khan's preserved Eighth Amendment claims stand or fall under either standard.

828 F.2d 651, 653 (10th Cir. 1987) (per curiam), this court held that providing one hour of outdoor exercise per week does not, "without more," violate the Eighth Amendment. We see nothing "more" in the SAC that plausibly elevates Khan's allegations into a cognizable Eighth Amendment claim. Nor has Khan offered anything that leads us to believe he could remedy this deficiency by further amending his complaint. Dismissal of Count 5 for failure to state a claim for relief was therefore proper.

2. **Sunlight-deprivation claim (Count 4)**

We also conclude that Khan failed to state a claim regarding the deprivation of sunlight. As noted, the district court did not directly address this claim or cite a case expressly concerning sunlight deprivation. To the extent the court relied on *Fogle* as support for its objective-component analysis, that reliance was incorrect. *See Lowe v. Raemisch*, 864 F.3d 1205, 1209-10 & n.9 (10th Cir. 2017) (explaining that *Fogle*'s pronouncement on the length of the deprivation was confined to the subjective component); *see also Apodaca v. Raemisch*, 864 F.3d 1071, 1079 n.5 (10th Cir. 2017) (stating, in case related to *Lowe*, that "*Fogle*'s discussion of the duration of the deprivation was based on the standard for frivolousness and the subjective prong of the Eighth Amendment"). Furthermore, although Fogle was denied all outdoor exercise for three years, there is no indication whether that meant he was also completely denied exposure to sunlight.

We are unaware of any case law expressly considering whether depriving a person of sunlight for three-plus years involves a substantial risk of serious harm.

14

The only harm Khan alleges is the Vitamin D deficiency accompanied by "*extreme joint pain, unusual [mood] shifts, muscle cramping, and headaches.*"  R. at 586, ¶ 48 (emphasis added).  Although a close question, the allegation of "extreme joint pain" might push this claim across the plausibility line with regard to the objective component.  *See Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (defining "substantial harm" in the delayed-medical-care scenario as "lifelong handicap, permanent loss, or *considerable pain*" (emphasis added) (internal quotation marks omitted)).[9]

We need not definitively rule on the objective component, however, because the sunlight-deprivation claim falters on the participation requirement.  In Count 4, Khan named defendant Barela in his individual and official capacities and the Board in its official capacity.  But because Khan seeks only damages, his claim may proceed against Barela only in an individual capacity.  *See Brown v. Montoya*, 662 F.3d 1152, 1161 n.5 (10th Cir. 2011) (explaining that a § 1983 plaintiff "may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive relief").  Moreover, "[a] § 1983 defendant sued in an individual capacity may be subject to personal liability and/or supervisory liability."

_____

[9] We recognize that Khan's claim is not for deliberate indifference to his medical needs but for failing to protect him from a risk of harm associated with the deprivation of sunlight.  Regardless, *Mata*'s definition of "substantial harm" sheds some light on Khan's pleading burden.  It does not appear Khan sustained "lifelong handicap" or "permanent loss," *Mata*, 427 F.3d at 751, because he alleged his "health . . . stabilized" after he left DACDC because he can now "regularly . . . access sunlight," R. at 587, ¶ 67.

15

*Id.* at 1163. "Personal liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Id.* (internal quotation marks omitted). A § 1983 plaintiff can establish a supervisor's liability by showing "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). Regarding the Board, a claim for damages against municipalities and other local governmental units requires a plaintiff to, among other things, "identify a . . . policy or custom that caused the plaintiff's injury," *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997), and "demonstrate that, through its *deliberate* conduct, the [governmental unit] was the moving force behind the injury alleged," *id.* at 404 (internal quotation marks omitted).

Here, Khan alleged that "[b]ecause officers were given discretion to decide when exercise opportunities occur, they would announce yard access at early morning hours when there was no sunlight." R. at 586, ¶ 47. This clearly indicates the timing of exercise was a matter of detention-officer discretion. Furthermore, Khan's only allegation regarding Barela's or the Board's involvement in the deprivation of sunlight is that they "were aware that deprivation of access to the sun . . . [was] detrimental to the overall health and safety of the inmate population." R. at 587, ¶ 65. This conclusory allegation does not plausibly suggest that Barela or the Board even knew about the timing of outdoor exercise, let alone that Barela was

16

personally involved in it, that the Board's "*deliberate* conduct . . . was the moving force behind the injury alleged," *Brown*, 520 U.S. at 404 (internal quotation marks omitted), or that Barela "promulgated, created, implemented or possessed responsibility for the continued operation of a policy," *Dodds*, 614 F.3d at 1199, regarding the timing of outdoor exercise. Khan therefore failed to plausibly allege Barela's or the Board's involvement, and nothing in Khan's brief suggests that further amendment of his complaint would remedy this shortcoming.

C.      **Count 6 (visual strip search and body-cavity inspection)**

In Count 6, Khan alleged Barela and the Board violated his Fourth and Fourteenth Amendment rights by promulgating a policy requiring visual strip searches and visual body-cavity inspections after a detainee returns from an outside medical appointment or court appearance. Khan alleged he was subjected to these searches and inspections on multiple such occasions, but not when he was first booked into the DACDC or any of the other times he was rebooked into the facility (apparently after absences as long as two months, *see* R. at 579-80, ¶ 4). Khan alleged the policy was meant to "punish prisoners, including [himself], for invoking their right to be heard at Court and otherwise seek medical care," R. at 590, ¶ 99, and that the policy does not otherwise authorize such a procedure "absent reasonable suspicion," *id.*, ¶ 97.

The district court concluded that this claim failed because under *Wolfish* and related case law, visual body-cavity inspections after an inmate has contact with a person outside the prison are constitutional even absent probable cause or reasonable

17

suspicion to believe the inmate is concealing contraband, and the inspections Khan alleged were no more intrusive than those in *Wolfish*. *See* R. at 668-69.[10] The district court's analysis overlooks the critical allegation here—that Khan was subjected to these searches only when returning from a medical procedure or court dates, but not when he initially arrived at the facility or on occasions when he was re-booked into the DACDC after other absences. Indeed, the district court did not address this allegation at all.

We agree with Khan that this selective use of the search procedure plausibly suggests he was subject to the search not because of a fear he was concealing contraband, but because Barela and the Board want "to punish prisoners . . . for invoking their right to be heard at Court and otherwise seek medical care," R. at 590, ¶ 99. Viewed against those times when Khan was not searched after having contact with persons outside the DACDC, the searches Khan complains about appear arbitrary and undermine the legitimate penological interest in discovering contraband. *See Colbruno v. Kessler*, 928 F.3d 1155, 1162-63 (10th Cir. 2019) (analyzing pretrial detainee's Fourth Amendment claim against state actors arising from transport from ambulance into hospital without any clothes under Fourteenth Amendment's Due Process Clause and applying *Wolfish*'s "arbitrary or purposeless" test). Perhaps these searches were only a matter of inconsistent policy application, as

---

[10] The district court also considered Khan's allegation that he was subjected to pat searches before court dates, but as we read the SAC, Khan's claim is confined to the constitutionality of the visual strip searches and visual body-cavity inspections.

18

Khan has not clearly stated the purpose of those absences from DACDC after which he was not subject to visual strip searches and body-cavity inspections. Nonetheless, we conclude that Count 6 states a plausible claim for relief.

D.    **Count 7 (inadequate clothing)**

In Count 7, Khan alleged an Eighth Amendment violation based on (1) the failure to provide undergarments, socks, and cold-weather clothing; and (2) a detention officer's denial of his request for an immediate uniform exchange after Khan got another inmate's hair and blood on his uniform following a haircut, because of a strict policy of allowing uniform exchanges only on exchange days, which occur twice a week. The district court addressed this claim as part of its six-claim Eighth Amendment analysis, but the court cited no cases involving inadequate cold-weather or potentially biohazardous clothing. *See* R. at 663-67.

On appeal, Khan argues that inmates have a constitutional right to adequate and reasonably clean clothing. We agree that, as a general principle, not providing adequate cold-weather clothing could violate the Eighth Amendment. *See Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998) ("The Eighth Amendment requires jail officials to provide humane conditions by ensuring . . . adequate . . . clothing[.]" (internal quotation marks omitted)). But Khan's only allegation regarding the effect of this deprivation was that it led to him being "exposed to the elements during winter without the benefit of cold weather clothing," R. at 590, ¶ 107. This conclusory allegation does not explain the "circumstances, nature, and duration of the challenged condition[]," all of which are relevant to the objective-component inquiry.

19

*DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) (internal quotation marks omitted); *see also Benefield v. McDowall*, 241 F.3d 1267, 1272 (10th Cir. 2001) ("The actual extent of any physical injury, threats or psychological injury is pertinent in proving a substantial risk of serious harm."). Khan therefore failed to plausibly "show that conditions were more than uncomfortable" but "instead rose to the level of conditions posing a substantial risk of serious harm to [his] health or safety," *DeSpain*, 264 F.3d at 973, and nothing in his appellate brief suggests he could remedy this defect by further amending his complaint. We therefore conclude that this portion of Count 7 fails to state a claim for relief.

We also agree that forcing a detainee to remain in clothes that have another inmate's blood and hair on them could pose an objectively substantial risk of serious harm. But Khan did not allege any injury from this one-time occurrence. Accordingly, we conclude that this part of Count 7 fails to state a claim for relief and that amendment would be futile. *See DeSpain*, 264 F.3d at 973-74; *Benefield*, 241 F.3d at 1272.

E.     **Count 8 (use of chlorine in dishwashing)**

In Count 8, Khan alleged that throughout his detainment at DACDC, he received an inadequate diet (too many carbohydrates, insufficient protein) and that he ingested chlorine defendant Aramark used in the dishwashers. The district court addressed this claim as part of its six-claim Eighth Amendment analysis, but it made no separate conclusions regarding diet or chlorine use and cited no cases on point. *See* R. at 664-67.

20

On appeal, Khan limits his argument to the use of chlorine. He states that he "allege[d] that he developed colorectal polyps and is at increased . . . risk of colon cancer because of the Defendants' use of chlorine in and/or around food." Aplt. Br. at 22. This is an inaccurate characterization of the SAC. The SAC alleged that the inadequate diet caused the polyps and increased cancer risk. *See* R. at 591, ¶ 126 ("But for the inadequate diet . . . Khan would not have developed colorectal polyps"); R. at 592, ¶ 127 ("But for the inadequate diet . . . Khan would not be at increased and extreme risk of developing colon cancer"). Its only allegation of harm regarding chlorine use was that it puts Khan "at major risk for future health complications including . . . brain . . . [and] heart degeneration." *Id.* at 592, ¶ 132. This conclusory statement is too insubstantial to satisfy *Farmer*'s objective component, and he has provided no basis for us to believe he could remedy this defect by further amending his complaint. We therefore conclude that Count 8 fails to state a claim for relief and dismissal was proper.

F. **Count 10 (religious-item and Ramadan-meal claim)**

Khan based Count 10 on the First Amendment's Free Exercise Clause and the Fourteenth Amendment's Due Process Clause, and he named Barela, the Board, and the two chaplains as the relevant defendants. He alleged that Chaplains Stickles and Beam refused to allow him to access or possess a clock, prayer schedule, and Muslim calendar so he could be aware of when the Muslim holy month of Ramadan occurred and be able to observe it. The chaplains told him providing such items or access to them was against DACDC policy. He also alleged that in 2014, he asked about

21

getting a special diet for Ramadan, but the chaplains told him they had nothing to do with food service. Then, in 2016, Chaplain Stickles told Khan that the DACDC would provide a special Ramadan meal. Khan requested one, but the meal detention officers served him consisted only of a loaf of bread and three slices of ham. Khan alleged that "[n]otwithstanding that Muslims do not eat pork or related products," he told the officers that the special Ramadan meal, which was the only meal he would be eating during Ramadan (he fasted during daylight hours), "was nutritionally inadequate to sustain human life." R. at 593, ¶ 146. The officers told him to "take it or leave it," *id.*, ¶ 147 (internal quotation marks omitted), and told Khan he would be getting the same meal every day during Ramadan. Khan alleged that because this "would result in a health hazard," *id.*, ¶ 149, he was forced to forego participating in Ramadan, apparently so that he could get served ordinary meals. He alleged that serving "HAM on Ramadan was done intentionally to punish Muslims for their beliefs." *Id.*, ¶ 151.

1. **Ramadan-meal claim**

We begin with the Ramadan-meal portion of this claim. The district court analyzed that portion of Count 10 to determine if defendants substantially burdened Khan's sincerely held religious beliefs, concluding that "[a]lthough Khan claims that he decided not to participate in Ramadan because the meals given were incorrect and nutritionally inadequate, these allegations do not show that prison officials prevented him from participating in Ramadan." R. at 672. That may be true, but it is not dispositive. As we explain, even if serving ham and bread as the Ramadan meal did

22

not directly prevent Khan from participating in Ramadan, that conduct put considerable pressure on Khan not to engage in the Ramadan fast, which constitutes a substantial burden on religious exercise.

To state a claim for violation of the First Amendment's Free Exercise Clause, a plaintiff must plead facts that plausibly show or allow the inference that the prison regulation or action at issue "substantially burdened sincerely-held religious beliefs." *Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007) (ellipsis and internal quotation marks omitted). Khan's allegations can plausibly be read as stating that his desire to observe Ramadan's fasting and prayer schedule reflects sincerely held religious beliefs. Relevant to that inquiry, Khan alleged as follows: He "is a Muslim who practices Islam" and "holds Islam to be his religious belief." R. at 592, ¶¶ 134-35. "Islam requires strict adherence to five pillars of faith," which include "Prayer" and "Fasting." *Id.*, ¶ 136. He required access to a prayer schedule so he could pray at the five specific, required times each day. R. at 593, ¶ 137. (This allegation, which is primarily relevant to his religious-item claim, also would appear to require a clock, as he allegedly requested.) He needed a calendar because Ramadan occurs only during "a single lunar month once per year." *Id.*, ¶ 138. And "Ramadan requires Muslims to fast during daylight hours and only ingest food during darkness." *Id.*, ¶ 139.[11]

_____

[11] It would not be appropriate to summarily dismiss this claim on the sincerity prong because Khan's alleged religious beliefs are not "so bizarre, so clearly nonreligious in motivation that they are not entitled to First Amendment protection." *Kay*, 500 F.3d at 1219-20 (internal quotation marks omitted).

23

Khan also plausibly alleged that defendants substantially burdened his religious exercise when they served him ham and bread as a special Ramadan meal. In *Abdulhaseeb v. Calbone*, 600 F.3d 1301 (10th Cir. 2010), we described three ways a government can substantially burden a religious exercise.[12] First, a government can substantially burden a religious exercise when it "prevents participation in conduct motivated by a sincerely held religious belief." *Id.* at 1315. The district court appears to have invoked this method in its Ramadan-meal analysis when it stated that Khan's allegations failed to "show that prison officials prevented him from participating in Ramadan," R. at 672.

But "a burden can be 'substantial' even if it does not compel or order the claimant to betray a sincerely held religious belief." *Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014). Accordingly, a second way a government can substantially burden a religious exercise is by "plac[ing] substantial pressure on an adherent either not to engage in conduct motivated by a sincerely held religious belief or to engage in conduct contrary to a sincerely held religious belief." *Abdulhaseeb*, 600 F.3d at 1315; *see also Yellowbear*, 741 F.3d at 55 ("[A] burden can be 'substantial'" when "the claimant is presented with a choice in which he faces considerable pressure to

---

[12] *Abdulhaseeb* was a RLUIPA case. But because Congress intended "substantial burden" under RLUIPA to be interpreted consistent with "the Supreme Court's articulation of the concept of substantial burden on religious exercise," *Abdulhaseeb*, 600 F.3d at 1315 (brackets and internal quotation marks omitted), our discussion of substantial burden in *Abdulhaseeb* and other RLUIPA cases applies as well to a First Amendment free-exercise claim.

abandon the religious exercise at issue.").  This can occur "where the government presents the plaintiff with a Hobson's choice—an illusory choice where the only realistically possible course of action trenches on an adherent's sincerely held religious belief."  *Abdulhaseeb*, 600 F.3d at 1315.

The third way a government can substantially burden a religious exercise is when it "requires participation in an activity prohibited by a sincerely held religious belief."  *Id.*

When detention officers served Khan ham and bread as his Ramadan meal, they presented him with a three-cornered Hobson's choice.  First, Khan could have refused to eat the meal, which he was told would be served daily for the duration of the Ramadan holiday, and continued with the Ramadan fasting schedule, but then he would have gotten no food for the remainder of Ramadan, which lasts approximately one month.  Second, Khan could have eaten the meal and continued with the Ramadan fasting schedule, but that would have violated the "Islamic dietary tradition[]" of "halal," which "prohibits . . . pork," *id.* at 1313 (internal quotation marks omitted); *see also* R. at 593, ¶ 146 (Khan's allegation that "Muslims do not eat pork or related products," which was apparently relayed to detention officers).  Third, and what he apparently chose to do, Khan could have given up trying to observe the Ramadan fasting schedule so he could access adequate nutrition provided during daylight hours, which is conduct his religious beliefs prohibit.  We have held that similar choices constitute a substantial burden on sincerely held religious beliefs. *See Abdulhaseeb*, 600 F.3d at 1317 (concluding that "failure to provide a halal diet

25

either prevents [a Muslim's] religious exercise, or, at the least, places substantial pressure on [a Muslim] not to engage in his religious exercise by presenting him with a Hobson's choice—either he eats a non-halal diet in violation of his sincerely held beliefs, or he does not eat."); *id.* at 1319-20 ("If an inability to eat proper foods for a religious holiday prevents one from engaging in conduct motivated by a sincerely held religious belief or forces one to engage in conduct prohibited by a sincerely held religious belief, it may constitute a substantial burden."); *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1211-13 (10th Cir. 1999) (recognizing spiritual importance of Ramadan fast).[13] Khan's Ramadan-meal claim, therefore, plausibly alleged a constitutional violation.[14]

## 2. **Religious-item claim**

Turning to the religious-item portion of Count 10, the district court ruled that "prison restrictions, such as those placed on the possession of calendars, clocks, and schedules, . . . do not raise constitutionally protected procedural or substantive due

---

[13] It appears Khan could have eaten the bread without violating his beliefs, but the option to eat only bread presents as much of a Hobson's choice as the option not to eat at all.

[14] To the extent Khan was required, as part of his free-exercise claim, to "plead facts from which a plausible inference can be drawn that the action was not reasonably related to a legitimate penological interest," *Gee*, 627 F.3d at 1188, Khan met his burden by alleging that serving him "HAM on Ramadan was done intentionally to punish Muslims for their beliefs," R. at 593, ¶ 151. *See Makin*, 183 F.3d at 1212 (explaining that it is "unacceptable" for "prison authorities [to] burden the observance of religious practices for no legitimate reason at all"); *see also Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002) ("This circuit recognizes that prisoners have a constitutional right to a diet conforming to their religious beliefs.").

process concerns." R. at 672 (citing *Gowadia v. Stearns*, 596 F. App'x 667, 672 (10th Cir. 2014), and *Kennedy v. Blankenship*, 100 F.3d 640, 642-43 (8th Cir. 1996)). We are hard-pressed to understand this explanation for dismissing the religious-item portion of this claim. Neither of the cases the district court relied on involved the Free Exercise Clause or pretrial detainees, and neither case lends any obvious support for the district court's conclusion. The portion of *Gowadia* the district court cited involved a Fifth Amendment due-process claim concerning an inmate's transfer to the Administrative Maximum Facility in Florence, Colorado, and the imposition of special administrative measures on communications and visitations. *See Gowadia,* 596 F. App'x at 672. Resolution of that claim turned on an analysis of whether the conduct posed an atypical and significant hardship under *Sandin v. Conner*, 515 U.S. 472 (1995), and its progeny and therefore created a liberty interest protected by due process. *See Gowadia*, 596 F. App'x at 672-74. *Kennedy* concerned whether a transfer from administrative segregation to punitive isolation for refusing to report for work duty and obey a direct order was, under *Sandin*, an atypical, significant deprivation and created a liberty interest supporting a due process claim. *See Kennedy*, 100 F.3d at 641-43. Neither case, therefore, is relevant to the religious-item claim.

We conclude that Khan's allegations plausibly demonstrate a substantial burden on his sincerely held religious beliefs. We have already addressed the sincerity of his religious beliefs. And in refusing to allow him to access or possess a clock, prayer schedule, and Muslim calendar, defendants may have "prevent[ed] [his]

27

participation in conduct motivated by a sincerely held religious belief," *Abdulhaseeb*, 600 F.3d at 1315, namely, the ability to pray at the required times on a daily basis and to identify when to observe Ramadan. Khan did not allege "facts that explain why the usual justifications for the complained-of acts do not apply," *Gee*, 627 F.3d at 1185, but this claim is not facially meritless, and the district court did not properly analyze it. Under these circumstances, we will not fault Khan for failing to make the required allegation regarding "usual justifications." *See id.* at 1186 (explaining that a judge should "explain the pleading's deficiencies so that a prisoner with a meritorious claim can then submit an adequate complaint").[15] On remand, the district court can either require Khan to make the necessary allegations or allow defendants to proffer justifications for their conduct and then evaluate those justifications under *Turner v. Safley*. *See Kay*, 500 F.3d at 1218-19 (explaining that after a prisoner establishes a substantial burden, "defendants may identify the legitimate penological interests that justified the impinging conduct," at which "point[] courts balance the factors set forth in *Turner . . .* to determine the reasonableness of the regulation" (brackets and internal quotation marks omitted)).

_____

[15] Unlike Count 3, where we considered an obvious justification for banning hardcover books and newspapers despite a similar shortcoming in Khan's allegations, no usual justifications for denying these religious items are readily apparent. For example, Khan did not allege he wanted defendants to pay for these items, so a financial justification is not obvious.

28

G.     **Counts 11 and 12 (Establishment Clause and equal-protection claims)**

Khan based Count 11 on the First Amendment's Establishment Clause and the Fourteenth Amendment (presumably its Due Process Clause). He based Count 12 on the Equal Protection Clause, citing both the Fifth and Fourteenth Amendments. In support of these claims, he detailed a variety of conduct (*see* R. at 594-95, ¶¶ 153-80) that allegedly favored Christians over Muslims and was designed to force detainees "to ascribe to Christianity," R. at 595, ¶ 179.

The district court acknowledged these allegations generally but directly addressed only one—that three times in four years, Khan was forced to listen to a Christian sermon, and when he complained and asked to go to the recreation yard, a detention officer told him that further complaint would result in disciplinary action, R. at 595, ¶¶ 169-73. Citing *Abdulhaseeb*, the court concluded only that this allegation did not show Khan "was required by prison officials to participate in an activity prohibited by his sincerely held religious beliefs." R. at 672.

The district court's conclusion regarding this allegation evidences that the court reviewed it only as part of a free-exercise claim. *See Abdulhaseeb*, 600 F.3d at 1315 (explaining that a government can substantially burden a religious exercise by requiring "participation in an activity prohibited by a sincerely held religious belief"). But Khan raised the allegation as part of his establishment and equal-protection claims. The district court erred in its analysis because the "substantial burden" standard is part of a free-exercise analysis; it is not relevant to either an Establishment Clause claim or an equal-protection claim. *See United States*

29

*v. Batchelder*, 442 U.S. 114, 125 n.9 (1979) ("The Equal Protection Clause prohibits selective enforcement based on an unjustifiable standard such as race, religion, or other arbitrary classification." (internal quotation marks omitted)); *Brown v. Gilmore*, 258 F.3d 265, 274 (4th Cir. 2001) ("The Establishment Clause limits any governmental effort to promote particular religious views to the detriment of those who hold other religious beliefs or no religious beliefs, while the Free Exercise Clause affirmatively requires the government not to interfere with the religious practices of its citizens.").

Khan's appellate argument essentially urges us to analyze these claims under other principles he identifies. *See* Aplt. Br. at 26-28. We decline to do so in the first instance, for two reasons: (1) the district court failed to address the entirety of Khan's allegations supporting his establishment and equal-protections claims; and (2) the court applied an incorrect substantive legal framework to the plausibility analysis. Instead, we reverse the district court's dismissal of Counts 11 and 12 and remand for the court to remedy these defects.

H.    **Count 13 (medical care)**

In Count 13, Khan alleged defendants Barela, Corizon, and three Corizon employees (administrator Duran, nursing director Rush, and Nurse Bright) were deliberately indifferent to his medical needs in violation of the Eighth Amendment. Khan alleged that in April 2014, he sought treatment for depression and attention deficit disorder. At some point in the ensuing month, Nurse Bright evaluated him and recommended he see the staff psychiatrist. When Khan returned to the mental

30

health unit several weeks later, "he was told that he would see a counselor, not the psychiatrist." R. at 596, ¶ 195. Khan did not want to see the counselor because he feared the counselor would disclose information to law enforcement authorities. "Khan returned to his pod but was assured he would see the Psychiatrist soon." R. at 597, ¶ 197. Several weeks later, the same thing occurred, and "Khan was sent back to his pod to cool down." *Id.*, ¶ 200 (internal quotation marks omitted).

Khan then asked his criminal defense attorney to get involved. The attorney sent a letter to Barela explaining the situation, but Barela never replied. The attorney spoke with Corizon administrator Duran about getting psychiatric care. Duran said he would get back to the attorney but never did. Khan then asked Corizon nursing director Rush to intervene. Rush told Khan he first had to be interviewed, to which Khan responded that Nurse Bright had evaluated him more than a year earlier. Rush said she would see what could be done. Several weeks later, Khan, who by then "was severely paranoid, agitated, depressed, and frankly suicidal," *id.*, ¶ 210, asked his unit lieutenant for help. After the lieutenant intervened, the psychiatrist saw Khan and "immediately prescribed Prozac." *Id.*, ¶ 212. After a month of taking Prozac, "Khan improved dramatically." *Id.*, ¶ 213.

Khan further alleged that "Corizon has a custom, throughout its entire corporation, to severely delay prisoners' care to save money." R., at 598, ¶ 215. That custom, along with a failure to reprimand, permits employees to ignore inmates' requests for mental health services. Corizon also does not require supervision of

31

DACDC's mental-health gatekeeper, Nurse Bright, and there is no "fail safe to ensure that prisoners get needed psychiatric care." *Id.*, ¶ 218.

The district court concluded that Khan's allegations were sufficiently plausible with respect to the objective component of a deliberate-indifference claim but not the subjective component. The court reasoned that at most, Khan's allegations "might support a state-law medical negligence claim, but do not rise to the level of unconstitutional indifference." R. at 675.

We agree with the district court. To survive dismissal based on the subjective component of the test for deliberate indifference to medical needs, a plaintiff must plausibly allege that a defendant knew of and disregarded "an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn, and [the defendant] must also draw the inference." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (internal quotation marks omitted).

Although a gatekeeper such as Nurse Bright "may be held liable under the deliberate indifference standard if she delays or refuses to fulfill that gatekeeper role," *id.* (internal quotation marks omitted), Khan's allegations indicate that Nurse Bright in fact recommended he see a psychiatrist, so he has not plausibly alleged that she acted with deliberate indifference. Critically, Khan failed to identify who decided he should see a counselor instead of the psychiatrist when he twice went to receive treatment. He also failed to plead sufficient facts regarding the reason that person gave for directing him to a counselor instead of the psychiatrist. Lacking such details, Khan's argument that the subjective component is met when a defendant

32

refuses to implement a medical order (assuming Nurse Bright's recommendation was such an order), has no grounds for traction on appeal.

As to defendants Barela, Duran, and Rush, the SAC lacks sufficient detail regarding what they were told for us to conclude that Khan plausibly alleged they acted with deliberate indifference. Similarly, Khan's allegations regarding Corizon's customs fail to show that any Corizon official who may have created those customs acted with deliberate indifference with respect to Khan. Khan's allegations regarding these four defendants are "bare assertions" amounting to "a formulaic recitation of the elements of a constitutional . . . claim" that are not entitled to the ordinary presumption of truth at the pleading stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

Because Khan failed to plausibly allege Count 13 and has provided no indication that he can correct the deficiencies through amendment of his SAC, we affirm the dismissal of Count 13.[16]

## VI. **Other arguments**

Khan raises two other general arguments we have not yet addressed. In the first, he argues that the district court took too long—22 months by Khan's count—to screen his SAC. To be sure, that seems too long. District courts are required to

---

[16] Our analysis makes clear that even if we reviewed Count 13 under the objective standard set forth in *Kingsley* for excessive-force claims, *see supra*, footnote 8, we would conclude that Khan's allegations do not show defendants' actions or inactions amount to objectively reckless disregard.

screen prisoner complaints against government entities, officers, or employees "before docketing, if feasible or, in any event, as soon as practicable after docketing." 28 U.S.C. § 1915A(a). Perhaps there is a good reason why 22 months was, in this case, "as soon as practicable after docketing," but we need not speculate. Khan has not shown any prejudice from that delay other than to submit that in taking so long, the district court provided itself time to conduct what amounts to a summary-judgment analysis that Khan was not permitted to respond to. We disagree. The district court did not stray beyond the boundaries of a § 1915(e)(2)(B)(ii) analysis. Furthermore, the screening statute, § 1915A(a), "does not require . . . that the plaintiff be provided an opportunity to respond before dismissal," *Plunk v. Givens*, 234 F.3d 1128, 1129 (10th Cir. 2000) (internal quotation marks omitted), and we have corrected what errors we found.

Khan's second general argument is that the district court should have granted his requests for pro bono counsel. A magistrate judge denied Khan's first motion for pro bono counsel because the underlying claims were not "sufficiently meritorious or complex" and Khan had, to that point, "been presenting his claims quite ably." R. at 35. The district court upheld those findings. *Id.* at 126. Khan filed a second motion for appointment of counsel, but then moved to strike it and have it delivered to the district court's pro bono panel instead. The magistrate judge denied that request because referral to the pro bono panel was not appropriate when Khan filed his first motion for counsel, and he had "offer[ed] nothing new to show that it is appropriate now." *Id.* at 181. The magistrate judge further found that Khan's "recent

filings continue to show that he is presenting his claims quite ably" and "he appears to comprehend and be more resourceful than the majority of pro se litigants." *Id.* And the magistrate judge remained "unpersuaded that the underlying claims are sufficiently meritorious or complex to warrant requesting the voluntary assistance of counsel." *Id.*

"We review the denial of appointment of counsel in a civil case for an abuse of discretion." *Rucks v. Boergermann*, 57 F.3d 978, 979 (10th Cir. 1995). We see none. The district court reasonably applied the relevant factors. *See id.* (listing relevant factors as "the merits of the litigant's claims, the nature of the factual issues raised in the claims, the litigant's ability to present his claims, and the complexity of the legal issues raised by the claims" (internal quotation marks omitted)). And on appeal, Khan has continued to demonstrate the ability to ably present legally plausible claims, none of which involve complexity beyond his legal acumen.

## VII. **Conclusion**

We reverse the district court's dismissal of Khan's action and remand for further proceedings consistent with this decision as to Counts 3, 6, 10, 11, and 12. We otherwise affirm the district court's dismissal of the SAC and its denial of Khan's motions for appointment of pro bono counsel.

Entered for the Court

Gregory A. Phillips
Circuit Judge

35